## Richmond

JO ANNE STRAUGHAN v. WARREN R. NASH, ET AL., ETC.

March 10, 1975.

Record No. 740595.

Present, All the Justices.

*J. M. H. Willis, Jr. (Willis, Garnett & Braxton, on brief), for plaintiff in error.*

*Benjamin H. Woodbridge; Gerald F. Daltan (Cox, Woodbridge, Smith & Scott; Scaife, Daltan & Rackley, on brief), for defendant in error.*

Harrison, J., delivered the opinion of the court.

Ernest Clarence Nash was struck and killed by an automobile driven by Jo Anne Straughan, and his personal representatives have recovered a judgment against her for $9,500. Straughan has appealed, and the dispositive error assigned is that Nash was guilty of contributory negligence which bars a recovery.

The accident occurred on March 18, 1972, at about 8 p. m. on Virginia Highway 3 in Stafford County, at a point immediately east of the intersection of this highway with Route 607. Route 3 is a four lane highway with two eastbound and two westbound lanes divided by a concrete median strip. In addition, and as one travels west, there is a left turn lane at the intersection of the highways. The night was clear and very dark, and the road was dry. There was no artificial illumination on the highway, and no other vehicles were involved.

Straughan was proceeding west on Route 3 en route to Fredericksburg. Prior to the accident she had crested a hill some 600 feet east of the intersection. From the crest of the hill appellant proceeded downgrade and to a point where the road levels out near the intersection. She was driving a 1971 Ford Mustang automobile, and with her was Mrs. Nancy Boyle. The decedent Nash was allegedly crossing the highway from south to north. The only witnesses to the accident were his companion, Clifton Strother, and the two occupants of the Straughan vehicle.

Appellant and Boyle gave substantially the same version of the accident. They estimated their speed at 50 to 55 m. p. h. and within the permissible speed limit. Straughan testified that she had been driving in the right or outside lane but that when she went over the crest of the hill and noted the intersection she moved her car into the passing lane. She said that her lights were on high beam but that they did not shine as far as they normally would because of the downward slope of the road. She said that as the car leveled out in its approach to the intersection, "all of the sudden" she saw two men who were also in the passing lane (then the middle lane) in front of her. The men were variously described as "very close together"; "they could have been holding each other"; and "one man was helping another man up". Straughan said that when she saw the men they were so close to her she did not think she could stop in time to avoid them. She said that her first impulse was to pull into the left turn lane and that she did cut her wheels to the left, but that as she did this one of the men, Strother, "that was holding onto this one [Nash]", ran to the left; that when this happened she cut her wheels to the right to avoid striking Strother; and that then Strother ran back and appeared to shove Nash. She testified that Nash was either shoved or ran directly into her lane, which was then the outside lane.

Trooper D. A. Bradner testified that he found a single 68-foot skidmark that was made by the right wheels of the Straughan automobile immediately prior to its striking Nash. He said this mark was entirely in the outside westbound lane and was 3 feet 1 inch from the right or north edge of the highway. Nash was struck with the front of the vehicle, and his body landed on the hood and partially shattered the windshield. The body of the decedent was either carried or projected a distance of

approximately 93 feet before it came to rest. Miss Straughan lost control of her car after impact, and it went approximately 324 feet before finally coming to rest.

Clifton Strother lived in the same house with the decedent Nash, with whom there was a family connection. Strother, who admitted that he and Nash had been drinking beer on the night in question, testified that they crossed over to the median strip on Route 3 and were walking east on this strip to the point where the highway widens to include the left turn lane at the intersection. Strother said that Nash was walking about 5 feet in front of him and that Nash started across the highway ahead of him. This witness first said that Nash crossed all the way over the highway and was on the right-hand [north] side. Later he said that Nash was on the edge of the highway. At one point Strother testified that he saw Miss Straughan's vehicle "after it struck him". Later he said that he was "about 10, 12, 15 feet" from the Straughan car when he first saw it. He estimated its speed at "approximately 75 to 80 feet — miles an hour". He placed the vehicle in the right-hand (outside) lane when the collision occurred between the vehicle and Nash and said at that time he [Strother] was standing "on the median strip".

Strother admitted that at one time he did leave the median strip and was in the left-hand turning lane but "when I heard the car I backed up and was on the median strip". When asked if he reached out for Nash or tried to grab him or assist him, he answered: "Not to my recollection. I don't know. I don't remember." He said Nash was walking across the highway making "long strides", "walking quickly", and he never stopped from the time he left the median strip until the time he was struck. He also testified that when Nash commenced to cross the highway after leaving the median strip he [Strother] looked and there was no traffic on the highway to his right, "there wasn't anything in view".

On cross-examination Strother was asked if he was concerned that Nash would not get across the highway and he responded: "I wasn't concerned about anything. I figured he could make it, he could walk across the highway." When asked if he did not shout a warning to Nash, he first responded "no". He was reminded that in a previous hearing he had testified that he did not follow Nash across the road because "I seen the car lights coming". When then asked if Nash went on anyway, he

responded "yes". He further admitted that at a previous hearing he testified that he called out to Nash "To hurry up, hurry up". And he answered in the affirmative to this question: "Now, as you were there, you perceived through sight or sound this oncoming vehicle and elected to go back to the median strip to safety, didn't you?"

Strother and Nash were dressed in dark clothing, described by the trooper as dull and nonreflective. Although the trooper arrived shortly after the accident occurred, he did not find Clifton Strother there. He later interviewed Strother at his home and said that Strother had been drinking.

We observe here that when an automobile strikes a pedestrian under the circumstances shown by this evidence there is negligence involved, negligence of the motorist or of the pedestrian, or of both.

It is the contention of appellees that their decedent crossed the highway in a normal manner, at a reasonable gait and without stopping. They say that the reason he was unable to complete his crossing safely was the excessive speed of the approaching Straughan car and the appellant's failure to maintain proper control and to keep a proper lookout.

Appellant says that she was operating the car at a reasonable and lawful speed and with all due care. She explains her failure to see the decedent before she did by the downgrade of the highway. She says that she saw Nash and Strother as soon as the lights of the car picked them up in the road, and that she applied her brakes and took such evasive action as was available to avert the accident. At the conclusion of the case the trial judge paid high tribute to appellant and commented on her "commendable honesty, candor and sincerity".

It is unnecessary that we determine whether or not appellant was guilty of negligence. Assuming, but not deciding, that there was negligence on her part, it is clear that Nash was himself guilty of contributory negligence as a matter of law. He did not exercise due care for his own safety.

Nash and Strother were in the act of crossing a widely traveled primary highway at a time when the Straughan vehicle was approaching dangerously near. The appellees do not claim that the decedent was sick or *in extremis,* so if the parties were in the road they were there voluntarily and in the face of her oncoming vehicle which was fully illuminated and in sight. As

we said in *Wong* v. *Terminal Cars, Inc.*, 201 Va. 564, 568, 111 S. E. 2d 799, 801-02 (1960): "It was much easier for this pedestrian to see the lighted cab approaching than it was for the driver to see the plaintiff, dressed in dark clothing on this dark, rainy night."

Strother testified that Nash started from the median strip across the west lanes of the highway making long strides and walking quickly, and never stopped from the time he left the median strip until he was struck. If we accept this version we must also accept the fact that Nash did this in the face of the oncoming Straughan vehicle which was so close that Strother (who said that he too started across the highway) had backed up to the median strip and was then shouting a warning to Nash. Strother saw the oncoming lights, heard the sound of the motor and retreated to the median strip and a place of safety. The evidence is bare of any explanation of why, under these circumstances, Nash attempted to cross the highway.

The evidence shows as a matter of law that the negligence of Nash was an efficient contributing cause to the accident.

In *Lindberg* v. *Goode*, 200 Va. 784, 108 S. E. 2d 364 (1959), we said:

"But if the defendant was negligent in not seeing the plaintiff in a situation of potential danger in time to have avoided him by exercising ordinary care, it is clear that the plaintiff was also negligent in failing to see or to heed the speeding car dangerously close as he started across the road. Each had the duty of looking and their opportunities of seeing were equal. . . .

\* \* \*

"It necessarily follows that he did not look before he started to cross, as defendant's evidence indicated, or if he looked he failed to see that the car was dangerously close but walked on across without again looking at it or paying any attention to it until, as he says, he was across the white line. In either event his negligence was a contributing cause of the unfortunate accident, and his case falls within the pattern of the following cases in which recovery was denied because of the contributory negligence of the plaintiff: [Citing numerous cases.]." 200 Va. at 787, 788-89, 108 S. E. 2d at 367-68.

In *Hopson* v. *Goolsby*, 196 Va. 832, 86 S. E. 2d 149 (1955), we commented on the duty of a pedestrian to use reasonable care to look when he steps into a street and as he continues across, and observed that:

"[I]f a person having a duty to look 'carelessly undertakes to cross without looking, or, if looking, fails to see or heed traffic that is obvious and in dangerous proximity and continues on into its path, he is guilty of negligence as a matter of law.' [Citing cases.]" 196 Va. at 839, 86 S. E. 2d at 153.

In *Sanford* v. *Mosier*, 201 Va. 358, 111 S. E. 2d 283 (1959), we noted that the plaintiff walked blindly into the path of an oncoming truck which was in plain view when, in the exercise of ordinary care, he should have known under the circumstances that an accident was inevitable. There we found the plaintiff's inattentive and heedless act created a condition under which the accident arose, and that he was at least the co-author of his own misfortune in that he carelessly, inattentively and in disregard of the rule of self-preservation continued to walk into a path of danger.

It was argued in *Sanford*, as it has been argued in the instant case, that plaintiff was but a split second from safety, and would have been off the road by the time the truck reached the point of impact, if the truck had even slightly reduced its speed or even slightly changed its course. We commented that the argument applied to possible negligence on the part of the defendant, but that it in no way lessened the duty of the plaintiff to exercise reasonable care for his own safety; and that if there was a reasonable opportunity for the plaintiff to avoid the accident up to the moment of its happening, it was his duty to do so.

Having determined that plaintiffs' decedent was guilty of negligence as a matter of law, we reverse the judgment appealed from and enter final judgment for the appellant.

*Reversed and final judgment.*